USDC SCAN INDEX SHEET

















JOEH   7/5/06   8:39

3:03-CV-00371   EYE LASER CARE V. MDTV

*163*

*P/A.*

1 | John R. Mayer (#197765)
DE CASTRO & MAYER, LLP
2 | 309 Laurel Street
San Diego, CA 92101
3 | Tel: 619-702-8690
Fax - 619-702-9401
4

FILED

06 JUL -3 PM 2:06

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

5 | JEFFREY H. GREGER, PC
2306 South Eads Street
6 | Arlington, VA 20022
Tel: 571-331-4949
7 | Fax: 703-979-3242

8 | CARL A. SALISBURY
HEATHER A. KORSGAARD
9 | KILLIAN & SALISBURY, P.C.
77 Brant Avenue, Suite 115
10 | Clark, New Jersey 07066
Telephone: (732) 827-8600
11 | Facsimile: (732) 827-0117

12 | Attorneys for Defendants and Third-Party
Plaintiff MDTV MEDICAL NEWS NOW, INC.
13

14 | **UNITED STATES DISTRICT COURT**

15 | **SOUTHERN DISTRICT OF CALIFORNIA**

16

17 | EYE LASER CARE CENTER, LLC ET AL
Plaintiffs
18 | v.

19 | MDTV MEDICAL NEWS NOW, INC. and
PAUL ARGEN
20
Defendants/Cross and Third
21 | Party Plaintiff,
v.
22
EYE LASER CARE CENTER, LLC ET AL
23 | and HECTOR J. GUALDA, RICHARD
SAX et al.
24
Defendants.
25

CASE NO. '03 CV 0371BEN (AJB)

**MDTV MEDICAL NEWS NOW INC.'S
AND PAUL ARGEN'S MEMORANDUM
AND POINTS AND AUTHORITIES IN
SUPPORT OF ITS MOTION FOR
PARTIAL SUMMARY JUDGMENT ON
LIABILITY AS TO STEPHEN
WEINSTOCK,MD AND THE
WEINSTOCK LASER EYE CENTER.**

Judge: Honorable Roger T. Benitez,
Presiding

Date: July 31, 2006
Time: 10:30 a.m.
Dept: 3

26

27

28

163

MDTV-MEMO IN SUPPORT

'03 CV 0371BEN (AJB)

## TABLE OF CONTENTS

TABLE OF CONTENTS…………………………………………………………………i

TABLE OF AUTHORITIES…………………………………………………… …ii


I.      INTRODUCTION……………………………………………………………2

        A.   Procedural Posture………………………………………………….3

II.     STATEMENT OF MATERIAL FACTS NOT IN DISPUTE……………5

        A.   Stephen Weinstock control over his medical practice…………7

III.    APPLICABLE LAW ……………………………………………………..13

        A.   Law on motion for summary judgment……………………….…13

        B.   Law on breach of Contract and Breach of duty of implied
             covenant of good faith and fair dealing………………………..13

IV.     DISCUSSION…………………………………………………………..14

V.      CONCLUSION…………………………………………………………21

## **TABLE OF AUTHORITIES**

**CASES**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, (1986)...................................... 13

*Barnes v. Burger King Corp.*, 932 F.Supp. 1420 (S.D. Fla. 1996).............. 14

*Burger King Corp. v. Weaver*, 169 F.3d 1310 (11th Cir. 1999)................. 13,14

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).................................................... 13

*Channell v. Applied Research , In*c., 472 So. 2d 1260 (Fla. 4th DCA 1985) ......................................................................................................................... 16

*Dad's Properties v. Albert C. Lucas*, 545 So.2d 926(Fla.2d DCA 1989) ......................................................................................................................... 16

*Henao v. Professional Shoe Repair, Inc.*, No. 5D05-2348 (Fla.App. 05/26/2006)........................................................................................................... 19, 20

*Insurance Concepts and Design, Inc. v. Healthplan Services, Inc.*, 785 So.2d 1232 ........................................................................................................ 14

*Madison v. La Sene*, 11 Wash, 2d 546, 268 P.2d 1006 (1954)..................... 17

*Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)........... 13

*Temporarily Yours-Temporary Help Services, Inc. v. Manpower, Inc.*, 377 So. 2d 825 (Fla. 1st DCA 1979)................................................................ 16

*West Shore Restaurant Corp. v. Turk.*, 101 So.2d 123 (Fla. 1958).............. 17

**STATUTES AND AUTHORITIES**

Fla. Stat § 542.33 (2005) ......................................................................... 19

Fla. Stat § 542.335 (2005) ....................................................................... 19

*John A.Grant & Thomas Steele, Restrictive Covenant: Florida
Returns to the Original "Unfair Competition" Approach to the 21st
Century*, 70 Fla. B.J. 53, 53-56 (Nov. 1996). ............................... 19,20

1      This Memorandum of Points and Authorities is being filed in Support of the Motion

2  of Defendant/Cross and Third Party Plaintiff MDTV Medical News Now, Inc., (MDTV) and

3  Paul Argen (ARGEN) filed concurrently herewith.

4

5  I. <u>INTRODUCTION.</u>

6

7

8      Plaintiff doctors Stephen Weinstock, Lee Nordan, Warren Cross, Michael

9  Mazaheri, Herbert Neveyas are all medical practitioners specializing in Ophthalmology.

10  Plaintiff doctor Norman Rappaport is medical practitioner specializing in Plastic and

11  Reconstructive Surgery. Plaintiff Eye Laser Care Center LLC is a business entity owned

12  by Doctor Lee Nordan and his business partner, attorney Richard Sax.

13      Defendant MDTV Medical News Now, Inc., is a New Jersey entity in the business

14  of providing medical information news to the public and provides marketing and

15  advertising services to medical practitioners. (MDTV). Defendant Paul Argen, a resident

16  of New Jersey is the CEO of MDTV.

17

18      MDTV started business in 1998. MDTV contracted separately with each plaintiff

19  doctor agreeing to provide certain marketing and advertising services for the doctor's

20  practices revolving around a 30-minute television program produced by MDTV called

21  "MDTV Medical News Now... ", which airs throughout the geographic United States in

22  selected cable markets. Each television show featured one of the plaintiff doctors as a

23  guest medical expert. In addition to its own MDTV television show featuring guest

24  doctors, MDTV offers advertising and marketing services to its guest doctors for use in

25  connection with the television show.

26

27

28

MDTV-MEMO IN SUPPORT

1    MDTV's contract with the Plaintiff Doctors contained certain restrictive covenants

2   limiting production and airing competing medical information videos/television programs.

3   The contracts also provided set pricing schedules and some similar but some different

4   conditions and terms unique to each plaintiff doctor.

5

6

7   A.  Procedural Posture.

8    In August 2002 MDTV brought suit in New Jersey State Court against Plaintiff

9   doctor Stephen Weinstock and former employees of MDTV alleging breach of contract

10   against Stephen Weinstock and tort claims against the Stephen Weinstock and two

11   MDTV ex-employees. A Temporary Restraining/Show Cause Order issued in the New

12   Jersey action against Stephen Weinstock. MDTV amended its State complaint to include

13   some but not all of the plaintiff doctors in the instant case and named John Does for yet

14   unknown defendants.

15

16    While the State Court case was pending, the instant Federal suit was filed by

17   attorney Richard Sax representing all plaintiff doctors and his business the Eye Laser

18   Care Center. MDTV amended its State court action a second time to include all federal

19   plaintiffs and filed a motion to stay the federal action. That motion was denied without

20   prejudice by Judge Lorenz and both cases proceeded parallel. The named defendant

21   doctors all moved for dismissal from the New Jersey State action for want of personal

22   jurisdiction and those motions were granted leaving only MDTV ex-employees remaining

23   in the state action, which eventually settled.

24

25

26

27

28

MDTV-MEMO IN SUPPORT
Summary Judgment Motion                    -3-                          '03 CV 0371BEN (AJB)l

1   MDTV answered and counterclaimed in the instant Federal action alleging counts

2   against all plaintiffs as counter defendants, their medical practices as third party

3   defendants, and one ex-employee Hector Gualda, as a third party defendant.

4
   MDTV settled all claims with plaintiff doctor Herbert Neveyas and his practice and the
5
   Neveyas plaintiff was dismissed from this case. MDTV moved to recuse attorney Richard
6
7   Sax as both a party to the action and attorney in view of his ownership of Eye Laser Care

8   Center, and Judge Hayes granted that motion to recuse.

9   Third Party Defendant medical practices owned by doctor Warren Cross, Dr.

10   Michael Mazaheri, and Dr. Norman Rappaport, namely, Bellaire Eye & Laser Center, The

11   Lasik Eye Center, and the Houston Center for Plastic Surgery , respectively, each moved

12   for dismissal for want of Personal jurisdiction, and those motions were granted by this

13
   Court. Similarly, Third party Defendant Hector Gualda moved for dismissal for want of
14
15   personal jurisdiction, and his motion was granted. Third Party Defendant The Weinstock

16   Laser Eye Center Answered and defended the third-party complaint against it.

17   MDTV dismissed all its counterclaims against Plaintiff doctors Warren Cross and

18   Norman Rapport and the Court Ordered the dismissal on March 27, 2006.

19   Weinstock Laser Eye Center moved for Summary Judgment but the Court's

20   current docket does not reflect the filing of the Motion. However, the parties completed

21   discovery and the Court set a date of July 31, 2006 as a hearing date for Summary

22
23   Judgment Motions.

24   MDTV and plaintiff doctor Michael Mazaheri settled their dispute and stipulated

25   dismissal papers have been filed with the court.

26

27

28

1       Currently pending in this case are claims by Eye Laser Care Center, Lee Nordan,

2   Warren Cross, Norman Rappaport and Stephen Weinstock against MDTV and Paul

3   Argen, all stemming from allegations of failed marketing and advertising provided by

4   MDTV.

5       MDTV has currently pending claims against Eye Laser Care Center, Lee Nordan,

6   Richard Sax, Stephen Weinstock and the Weinstock Laser Eye Center.

7

8       MDTV now moves the Court for a grant of partial summary judgment as to liability

9   against Stephen Weinstock and the Weinstock Laser Eye Center on its breach of

10  contract claim and breach of the implied covenant of good faith and fair dealing claim.

11

12

13  II.    STATEMENT OF MATERIAL FACTS NOT IN DISPUTE.

14

15

16      Plaintiff Stephen Weinstock, MD is an ophthalmologist with a practice in Florida.

17  (Complaint, ¶ 6). Plaintiff Weinstock asks this Court to apply Florida law. (Id., ¶¶ 79, 88,

18  93, 100, and 104).  Defendant MDTV Medical News Now, Inc., is a New Jersey entity

19  (hereinafter "MDTV"). (Id., ¶10).  MDTV provides nationwide commercial advertising and

20  marketing services for health practitioners. (Id., ¶16).  Co-defendant Paul Argen, a New

21  Jersey resident, is the Chief Executive Officer and agent of MDTV. (Id., ¶11).

22      In 1999 Stephen Weinstock, MD, ran the Weinstock Laser Eye Center.

23

24  (Complaint, ¶80:9).  Stephen Weinstock MD contracted with MDTV and entered into a

25  Professional Services Agreement including the production of a medical marketing

26  television show  featuring Stephen Weinstock as a guest medical expert. (MDTV Notice

27

28

1  of Lodgment(NOL) in Support of Summary Judgment at Exhibit C; and (Complaint at

2  Exhibit C).(hereinafter the Weinstock/MDTV Professional Services Agreement is also

3  referred to as "the Weinstock PSA").

4      MDTV produced a thirty (30) minute video television show featuring Stephen

5  Weinstock as a guest medical expert. A copy of the MDTV show featuring Stephen

6  Weinstock is attached. (MDTV NOL Exhibit I).   MDTV reserved all rights in its television

7
   production and expressly "granted a strictly limited license to use the program." (MDTV
8

9  NOL Exhibit C, Weinstock PSA at page 3).  The Weinstock PSA included a reservation of

10  rights in the MDTV show featuring Stephen Weinstock to MDTV with the exception of the

11  grant of "a limited license to air the completed program featuring you as a guest..." (Id.).

12      The agreement between MDTV and Stephen Weinstock was understood by

13
   Stephen Weinstock to include his medical practice. (MDTV NOL Exhibit A - S. Weinstock
14

15  Dep.Tr. at 93:17-21.)  Page one of the Weinstock PSA identifies Dr. Stephen Weinstock

16  as "medical practice or you." (MDTV NOL Exhibit C).

17      The Weinstock PSA included restrictive clauses, the pertinent ones at issue in this

18  motion included the understanding by Stephen Weinstock and his medical practice that

19
        You further agree that you will not enter into the business of creating
20      medical information or other health related talk shows for others (excluding
        your Practice) for a period of three years after the termination of this
21      agreement, and that you will never attempt to copy or otherwise reproduce
        the format and content of Medical News Now..., and that this prohibition will
22      remain in perpetuity.

23

24  Stephen Weinstock executed the Weinstock PSA on November 29, 1999 and initialed

25  each page of the PSA. (Id.).

26

27

28

1   A.  Stephen Weinstock's control over his medical practice.

2          For the time period of 1999-2003,  Stephen Weinstock was the only director,

3   owner and majority shareholder of Eye Physician of Pinellas, a Florida corporation doing

4   business as the Eye Institute of West Florida (hereinafter "EIWF").(MDTV NOL at Exhibit

5   A - S. Weinstock Depo Tr. at 19:21-20:11) and see (MDTV NOL at Exhibit M - Florida

6   
7   Sec. State Public Records).  At the same time Stephen was the administrative partner of

8   EIWF. (S. Weinstock Depo Tr. at 175:3).  "At all relevant times before and after

9   November 1999 [the parties] were fully aware that [Stephen Weinstock's] medical

10  practice in Florida was comprised of" ophthalmic medical services rendered in

11  conjunction with EIWF and the Weinstock Laser Eye Center where laser eye surgical

12  services are provided." (MDTV NOL- Exhibit K at ¶ 8. - Declaration of S. Weinstock April

13  24, 2006).  The Weinstock Laser Eye Center is the refractive surgery arm of EIWF. (Id.).

14  Stephen Weinstock had "no partners" in his medical practices. (MDTV NOL Exhibit A.

15  15:18). The formal legal entity "The Laser Eye Institute, Inc." does business as The

16  
17  Weinstock Laser Eye Center. (Id. at 49:18 referencing Ex. 16 at MDTV NOL Ex. B).

18          Stephen was in charge of the day to day operations of the Weinstock Laser Eye

19  Center in 2001. (MDTV NOL Ex. A. at 174:21).  For the same time period Stephen

20  Weinstock was the sole owner and shareholder of the Weinstock Laser Eye Center. (Id.

21  at 19:12-20, 58:12).

22          Stephen Weinstock entered into the Weinstock PSA with MDTV knowing that he

23  would be helping MDTV reach its goal of  "becoming a nationally recognized news source

24  for medical information." (Id. at 148:10).  By March 30, 2000 the initial production of the

25  MDTV television show featuring Stephen Weinstock as a guest was completed and

26  
27  
28

1   Stephen Weinstock informed MDTV in writing how impressed and pleased he and his

2   staff were with the MDTV product. (MDTV NOL Ex. B at 24.).

3   Stephen Weinstock paid MDTV to air the MDTV show featuring Weinstock for period of

4   time starting about April 2000 and running more than two years to at least as late as June

5   14, 2002. (MDTV NOL Exhibit N- EIWF checks for air time).

6

7       On February 27, 2002 Stephen Weinstock, using letterhead from EIWF,

8   communicated with MDTV's employee Scott Holm indicating a desire "to assist...to grow

9   MDTV and to keep our relationship strong." (MDTV NOL Ex. B at 31). The February 27,

10  2002 letter suggested a meeting to bring on additional EIWF doctors. (Id.).  Stephen

11  Weinstock "invited [Paul Argen] to come down to show [his partners] what he did have

12  and introduce him to the other doctors...hopefully [for a] win-win for all of us. But,

13  unfortunately, it didn't work out." (MDTV NOL Ex. A at 149:1-5). The Weinstock's wanted

14  MDTV to "splice" Robert Weinstock, Stephen's son and an employee of the Weinstock

15  Laser Eye Center, into the preexisting MDTV show featuring Stephen but MDTV refused.

16  (MDTV NOL Ex. C. at 97:1). Robert Weinstock was fresh out of medical school, just

17  completed residency, and only "recently joined the Eye Institute and the Weinstock Laser

18  Eye Center. (MDTV NOL Ex. K at ¶ ¶ 25, 27; and MDTV NOL at Ex. D - R. Weinstock Tr.

19  at 8:6-8). Robert Weinstock was not board certified like his much more experienced

20  father. (Id. at 27:11). (the names "Stephen" and "Robert" hereinafter are used where

21  appropriate to distinguish between the two Weinstocks).

22

23

24

25

26

27

28

1    Sometime in May of 2002 Stephen and Robert met with Scott Holm, an MDTV

2    employee[1], at EIWF, and discussed the formation of "Physicians News Network"or PNN.

3    (MDTV NOL Ex. D. Robert Weinstock Dep. Tr. at 31-33, 52:4-18). Scott Holm informed

4    Robert Weinstock of MDTV's air costs. (Id. at 36:9-12).

5    Stephen and Robert both understood in June 2002 that the Weinstock PSA "was

6    terminated because it was a two-year contract and ...when we did not come to agreement

7    with MDTV to renegotiate the contract and sign a new contract, there was no business

8    relationship at that time." (Id. at 37:1-7).  Stephen told Robert that they "were not under

9    contract with [MDTV]." (Id. at 37:19-20). The Weinstocks asked Scott Holm to work for

10   them and the Weinstocks formed PNN.

11   Instead of paying MDTV to produce new marketing videos, Stephen Weinstock

12   formed  PNN to make medical information television programs for the doctors within his

13   medical practice and intended to expand PNN and make videos for doctors "outside" his

14   practice "if it worked well." (MDTV NOL at Exhibit F. - New Jersey State Dep. Tr. of

15   Stephen Weinstock at page 31:2-10).  Despite the restrictive covenants to which he

16   agreed in the PSA, Stephen Weinstock wanted to circumvent MDTV and "do it for

17   ourselves." (MDTV NOL Ex. A - S. Weinstock Depo Tr. at 150:24-25).

18   Stephen Weinstock formed PNN with the Florida Secretary of State on June 4,

19   2002. (MDTV NOL Ex. B at 25). The forming of PNN "was a group decision" between the

20   partners of EIWF. (MDTV NOL Ex. A at 151:4).  Robert and Stephen both owned PNN.

[1] Scott Holm was still current employee of MDTV but allegedly informed the Weinstocks he was not. For purposes of this motion, this disputed fact of employee or ex-employee is irrelevant.

1   (MDTV NOL Ex. D at 45:18).  On July 24, 2002, Steven Weinstock formally cancelled all

2   program airing of the MDTV show featuring Stephen Weinstock as guest and notified

3   MDTV in writing. (MDTV NOL Ex. B at 26).

4       When MDTV became aware of PNN it sought injunctive relief in New Jersey State

5   Court. (MDTV NOL Exhibit E - Complaint Superior Court NJ Docket No UNN-C-116-02).

6   On August 2, 2002 a Temporary Restraining Order/Show Cause Order issued in State

7   Court in New Jersey ordering Stephen Weinstock to comply with terms of the PSA.

8   (MDTV NOL Ex. L - ORDER TO SHOW CAUSE Superior Court NJ Docket No UNN-C-

9   116-02).

10

11      During the same month of August 2002 there were three official filings concerning

12  the Florida entity Physician News Network. On August 1, 2002 Stephen transferred

13  resident agency responsibility to Robert. (MDTV NOL Ex. B at No. 27).  On August 22,

14  2002, Robert, then transferred resident agency responsibility to his co-worker Leonard

15  Kirsch MD. (Id., at No. 28).   On August 27 2002, Leonard Kirsch executed amendments

16  to the PNN articles of incorporation naming Leonard Kirsch as PNN's managing member

17  and the document was subsequently filed on September 24, 2002. (Id., at No. 29).

18

19      Stephen Weinstock resigned as the registered agent of PNN and turned PNN over

20  "the other principals to run it." (MDTV NOL Ex. A at 121:1-2).

21

22      On August 30, 2002 during deposition of Stephen Weinstock following the TRO

23  but prior to the "Show Cause" hearing, Stephen Weinstock stated that he formed  PNN to

24  make medical information television programs for the doctors within his medical practice

25  and intended to expand PNN and make videos for doctors outside his practice "if it

26  worked well." (MDTV NOL Ex. F at 31:2-10)(emphasis added).

27

28

Stephen Weinstock repeatedly testified that he "had absolutely no involvement, no participation, no ownership interest whatsoever in PNN" since August 2nd" 2002. (Id. at 53:8 and 46:11).  Stephen further testified that he had "no" understanding as to where PNN has its offices or where its business offices are since August 2nd, 2002. (Id. at 46:24).

On August 16, 2002, Stephen Weinstock certified to the New Jersey Court that he did not provide any information to anyone associated with PNN nor did he operate PNN through his son Robert nor controls Robert. (MDTV NOL Exhibit Q - August 21 2002 letter to Judge Span from counsel Joe Fell at Exhibit A attached thereto).  Further Stephen certified that "Robert Weinstock is not my business partner and any activities PNN has with other individuals is outside of my control." (Id.).

Although Stephen Weinstock represented to the New Jersey Court that he was no longer involved in PNN, his own company the Eye Institute of Florida thereafter issued checks for the filming and editing of PNN videos. (MDTV NOL Ex. D at 55:3-24.). At all times pertinent to this action Robert Weinstock was an employee of EIWF. (Id at 10:13-24.) At all times pertinent to this action Stephen Weinstock was the sole director and officer of EIWF and Weinstock Laser Eye Center. (MDTV NOL at Ex. M - Florida Corp. Records).

Thereafter, the Weinstocks met again with Scott Holm under an alleged guise of a new business entity called Medical News Network (MNN) and coordinated the production of a "competing video" for Medical News Network featuring Robert Weinstock as guest medical expert and featuring EIWF and the Weinstock Laser Eye Center. (MDTV NOL

1   Ex. A at 153:22 to 155-:4)  The meeting was conducted in Stephen Weinstock's medical

2   office. (Id.)

3          Robert and Stephen created a competing medical information show and the show

4   has been airing at least up through August 2005. (Id. at 154:23). A copy of the MNN

5   competing program featuring Robert Weinstock is attached. (MDTV NOL-Exhibit J).

6

7          Robert Weinstock did not believe he was bound to the terms of the PSA that his

8   father and employer Stephen Weinstock signed so he decided to "to make the video for

9   them, and it turned out pretty good." (MDTV NOL Ex. D at 64:12-15). Robert airs the

10  video on cable television once a week. (Id., 64:21).

11         The two medical information shows, Medical News Network (MNN), featuring

12  doctor Robert Weinstock as a guest medical expert and the MDTV Medical News Now

13  Inc... show, featuring doctor Stephen Weinstock as a guest medical expert, both discuss

14  identical Lasik procedures, both feature the Weinstock Laser Eye Center and its eye

15  doctors, both include exactly 30 minutes of programming with commercial sponsor

16  breaks and numerous other identical features unique to television formatting. (MDTV

17  NOL Exhibits G and H. Declarations of James Walsh and Paul Argen with detailed

18  comparison).

19

20         The MNN competing show is not a non-commercial show limited in any way to  the

21  medical practice of Stephen Weinstock; it is a commercially aired program benefiting

22  other national sponsors and created expressly for Medical News Network, a directly

23  competing entity with MDTV Medical New Now, Inc. (See MDTV NOL at Exhibit J; MDTV

24  NOL Ex. D at 64:12-15).

25

26

27

28

III.  APPLICABLE LAW.

A.  Law on motion for summary judgment

On a motion for summary judgment, it is the movant's burden to show an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325(1986). Federal Rule of Civil Procedure 56(e) shifts the burden to the non-movant to "go beyond the pleadings and by...affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts that show a genuine factual issue for trial.'" *Celotex Corp.*, 477 U.S. at 324.

"[M]ere allegations or denials" will not suffice to discharge a party' burden. FRCP 56(e).  All legitimate factual inferences must be made in favor of the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255(1986).  Rule 56(c) requires entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. Before determining no genuine issue for trial exists, the court must conclude that no reasonable trier of fact could find for the non-movant. *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587(1986).

B.  Law on Breach of Contract and Breach of duty of implied covenant of good faith and fair dealing.

Under Florida contract law, an implied covenant of good faith and fair dealing exists in every contract. *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1315 (11th Cir.

1   1999), cert. denied, 528 U.S. 948 (1999); *Barnes v. Burger King Corp.*, 932 F.Supp.

2   1420, 1438 (S.D. Fla. 1996). The duty is designed to protect "the reasonable

3   expectations of the contracting parties in light of their express agreement." *Barnes*, 932

4   F.Supp. at 1438.

5   A duty of implied covenant of good faith and fair dealing does not attach unless it

6   is shown there is a contractual obligation to perform and the defendant has violated the

7   express contractual provision. *Insurance Concepts and Design, Inc. v. Healthplan*

8

9   *Services, Inc.*, 785 So.2d 1232 (Fla.App. Dist.4 05/23/2001). The latter contractual

10  obligation and proof or lack thereof of a violation of an express contractual provision goes

11  hand-in-hand with a claim for breach of contract.

12

13

14  IV.  DISCUSSION.

15  The Weinstock PSA contained an express contractual provision, namely that

16  Stephen Weinstock MD would not "enter into the business of creating medical

17  informercials or other health-related talk shows **for others** (excluding your Practice) for a

18  period of three (3) years after the termination of this agreement."  (MDTV NOL Exhibit C.)

19  Concurrent with the termination of his contract with MDTV,  Stephen Weinstock formed

20  PNN expressly to do that which he agreed he would not do.  During the TRO hearing in

21  New Jersey State Court, the Judge stated "Weinstock must comply with the terms of

22  PSA...So when that PSA says he can't make movies or whatever it is, he can't. So to that

23

24  extent, he can't do that. All right." (MDTV NOL- Ex. P at p. 35).

25  After entry of the prohibition, Stephen Weinstock next appeared for deposition in

26  connection with a Show Cause order in August of 2002 on the very heels of forming

27

28

1   PNN, and responded to the question of whether or not he entered into the business to

2   produce health-related talk shows for others as follows:

3       Q.      And what was the idea of this business, this PNN? What did you
4               have in mind when you signed the Articles of Organization?

5               A.      I had in mind being able to make videotapes for educational
                        purposes for patients, as well as for airing a variety of different
6                       subjects around practice and other people in the practice.

7       Q.  And how about for other doctors outside of you practice?

8               A.      If it worked well within the practice, then that was the concept.
9                       If it could be done successfully, then it could be conceptually
                        expanded.
10

11              Transcript of Stephen Weinstock August 30, 2002 at MDTV NOL Ex. F.

12  p30:24-31:10.

13          Stephen Weinstock knew full well that the concept he gleaned from his business

14  relationship with MDTV could be done successfully. Stephen Weinstock paid MDTV in

15  excess of three-thousand dollars ($3,000.00) per month for MDTV to air the MDTV

16
17  Medical News Now... show featuring Stephen Weinstock as a guest medical expert, for a

18  period of time stretching from April of 2000 through as late as June of 2002, the very

19  month he formed PNN.

20          In his own words Stephen Weinstock admitted the truth; that he intended to use

21  PNN to produce televisions shows for other doctors.  Now, years later, Stephen

22
23  Weinstock submits numerous declarations and statements to this Court that contradict

24

25

26

27

28

1   his own prior sworn testimony to the extent he declares he never intended for PNN to

2   produce shows "for others"[2].

3       Stephen Weinstock attempts to cast all responsibility for the continuing efforts of

4   PNN and the later evolved MNN and the currently airing and competing television show

5   called Medical News Network featuring Dr. Robert Weinstock as a guest medical expert

6

7   as completely out of Stephen's control and authority. The facts belie Stephen's

8   representations and no reasonable fact-finder could determine otherwise.

9       The undisputed facts show that despite a temporary injunction issued in New

10  Jersey State Court, Stephen Weinstock turned over control of PNN to his son/employee

11  Robert, and his business partner Dr. Kirsch. Stephen Weinstock referred to them as the

12  other principals."  Stephen Weinstock and his cohorts failed to realize that "an injunction

13

14  not only binds the parties defendant but also those identified with them in interest, in

15  privity with them, represented by them or subject to their control." *Dad's Properties v.*

16  *Albert C. Lucas*, 545 So.2d 926(Fla.2d DCA 1989) citing *Channell v. Applied Research ,*

17  *Inc.*, 472 So. 2d 1260 (Fla. 4th DCA 1985); *Temporarily Yours-Temporary Help Services,*

18  *Inc. v. Manpower, Inc.*, 377 So. 2d 825 (Fla. 1st DCA 1979).

19

20      As the Florida Supreme Court stated and the Court in *Dad's Property*

21  recognized:

22

23      Covenants not to compete are in the best circumstances difficult to
        enforce...the coventee is required to become a policeman and detective to

24

---

[2] Compare Stephen Weinstock's current 2006 declaration "in fact, I formed PNN only to perform advertising

25  for myself and the other doctors with whom I practiced in the EIWF and the Weinstock Laser Eye Center
    (MDTVNOL Ex.K at¶ 22) with his 2002 sworn testimony that he intended to conceptually expand the

26  concept for doctors outside his practice if it worked well within the practice. *Supra.*

27

28

catch him. When...able to prove a breach...it is most difficult... to prove damages. For these reasons there are few types of contracts which require greater attention by the courts in their enforcement, and in so doing the moral obligation of the covenantor, the obligation to observe the spirit as well as the letter of the agreement, must be considered and enforced.

West Shore Restaurant Corp. v. Turk., 101 So.2d 123, 129 (Fla. 1958).

The Plaintiff in *West Shore* sought enforcement of a restrictive covenant against the defendant where the defendant's activity in operating common businesses and aiding and assisting through employees of the businesses violated the restrictive covenants. Moreover the Supreme Court noted the facts were not unlike facts where a court

enjoined a son, who was not a party to the restrictive covenant, from engaging with his father, party to the covenant, in a competing business prohibited by the covenant. The father sold his ...business and covenanted with purchaser not to engage in such business within a specified territory. The purchaser moved the location of the business and seller's son opened a similar business at the old location. The son was unskilled in the...business and the father participated in the business to some extent. The court found that the son had conspired with the father to break the restrictive covenant and new business was in reality owned by the father.

*West Shore* citing *Madison v. La Sene*, 11 Wash, 2d 546, 268 P.2d 1006 (1954).

In the instant case, Robert and Stephen Weinstock did the same thing. Robert was a new and inexperienced medical doctor moving into business with his father the more experienced and board-certified doctor.  Robert was not board-certified.  Stephen wanted Robert to be spliced into his MDTV video obviously to save money and impart the same impression and success Stephen and his medical practice enjoyed for two years airing the MDTV show. When MDTV refused for obvious reasons, the Weinstock PSA was terminated by the parties and restrictive covenants kicked in. In advance of termination and in calculated fashion months prior thereto, Stephen and Robert conspired not only

1    with each other, but with Scott Holm, the MDTV employee most knowledgeable about

2    MDTV and accessible to the Weinstocks.

3        This fact pattern is near identical to the factual analysis in *West Shore* and

4    *Madison* above.  Stephen Weinstock has violated both the spirit and the letter of the

5    agreement he made with MDTV.

6        In no uncertain terms, Stephen Weinstock contracted with MDTV knowing of the

7    restrictive covenant not to compete. The terms of the agreement make clear that MDTV

8    granted a limited license for Stephen Weinstock to air the MDTV television show

9    featuring Stephen Weinstock as a guest medical expert.  When the parties failed to

10   renegotiate the terms of that license, Stephen Weinstock was bound to a reasonable

11   restriction of three years in which time he agreed to not "enter into the business" of

12   producing medical infomercials or other health-related talk shows for others.  No

13   reasonable fact finder could find that Stephen Weinstock did not breach his agreement

14   and violate the duty of good faith when he planned and indeed legally formed a business

15   entity identified in its own Articles of Organization as "created and organized for the

16   purpose of producing and marketing advertising videos for physicians." (MDTV NOL at

17   Ex. B No. 25). Stephen Weinstock admittedly terminated the agreement to circumvent the

18   profit MDTV was making from airing the television shows. To boot, Stephen used MDTV's

19   employee Scott Holm to do it.

20       The three-year covenant not to compete contained in the Weinstock PSA was a

21   reasonable restriction based on the need to protect a legitimate business interest of

22   MDTV.  MDTV pled and identified the efforts it took to protect its legitimate business

23   interests including pleading that "[a]ll physician clients sign agreements to protect trade

24

25

26

27

28

MDTV-MEMO IN SUPPORT
Summary Judgment Motion                    -18-                    '03 CV 0371BEN (AJB)l

1  secrets and proprietary information and to prevent direct competition." See Docket No. 22

2  - MDTV's Answer and Counterclaim at p. 19 ¶ 7(C).  MDTV pled that Dr. Stephen

3  Weinstock violated the three-year provision of the restrictive covenant. Id. at p. 20 ¶12.

4

5          In accordance with of the Florida Statutes, contracts in restraints of trade

6  are valid expressly where:

7

8

9          (b)The licensee or anyone deriving title from the licensee, of the use of a
       trademark or service mark, and business format or system identified by that

10       trademark or service mark, may agree with the licensor to refrain from
       carrying on or engaging in a similar business...so long as the licensor...

11       continues to carry on a like business therein. Said agreements may, in the
       discretion of a court of competent jurisdiction, be enforced by injunction.

12       Fla. Statute at Title XXXIII - Chapter 542.33

13

14          For more than two years Stephen Weinstock, his medical practice and its

15  employees, all shared in the benefits gained by airing under license the MDTV Medical

16  News Now... television show including the distinctive MDTV Medical News Now Inc.,

17  federally registered service marks. (See MDTV NOL Exhibit O).

18          "In the case of a restrictive covenant sought to be enforced against a

19  former...licensee of a trademark or service mark and not associated with the sale of all or

20  part of [entities] a court shall presume as reasonable any restraint 1 year or less in

21  duration and shall presume unreasonable in time any restraint more than 3 years in

22  duration." See Fla. Statute at §542.335 (1)(d)2.

23

24          "Section 542.335 is broadly 'aimed at making enforcement of bona fide restrictive

25  covenants easier and more certain.'" *Henao v. Professional Shoe Repair, Inc.*, No. 5D05-

26  2348 (Fla.App. 05/26/2006), citing *John A.Grant & Thomas Steele, Restrictive Covenant:*

27

28

1   *Florida Returns to the Original "Unfair Competition" Approach to the 21st Century*, 70 Fla.

2   B.J. 53, 53-56 (Nov. 1996). Even if the restrictive covenant at issue were oppressive,

3   which it is not, overly restrictive covenants with extensive time restrictions are not stricken

4   as invalid but instead blue-penciled as a matter of law to be reasonable in time.  *Henao v.*

5   *Professional Shoe Repair, Inc.*, No. 5D05-2348 (Fla.App. 05/26/2006).

6

7        In this case the express contractual restriction was three years but Stephen

8   Weinstock did not even wait one year to violate the spirit and letter of the restriction.

9        Moreover, the Weinstock's also conspired and aided and abbetted and did

10  produce and currently air a competing television show which copied the format of the

11  MDTV show in a clear violation of the restrictive covenant that Stephen Weinstock would

12  not copy the format of the MDTV show. Any reasonable trier-of-fact that watches the

13  shows would have to come to the same conclusion that the MNN show copied the

14  "format" of the MDTV show. Although the Court could look at the detailed comparison of

15  the two shows attached to declarations of James Walsh and Paul Argen at MDTV NOL

16  Ex. G and Ex. H,  the mere viewing of the two shows leads to same conclusion. The

17  formats are identical in nearly every respect.

18

19       Stephen Weinstock and his son violated both restrictions in the covenants not to

20  compete.

21

22       The evidence indisputably shows a deliberate and willful violation of the

23  agreement. Stephen Weinstock was caught, attempted to wash his hands of guilt by

24  claiming he had no control over his son's activity which he clearly coordinated, condoned,

25  aided and abetted. The fact pattern in this case is very similar to the repugnant activity in

26  *Dad's Property* and *Madison.*

27

28

1    In view of the numerous instances of contradictory declarations made by Stephen

2  Weinstock in this case, as compared to his sworn testimony in the New Jersey State

3  Court case on the very same issues, the actions of Dr. Stephen Weinstock are perhaps

4  even more egregious.[3] The injustices cited herein have gone on without legal redress for

5  four years due to the declarations made by Stephen Weinstock in the New Jersey State

6

7  case. The declarations were made to extricate himself from the New Jersey Court's

8  jurisdiction.  MDTV has waited patiently for justice at great costs in time and money and

9  this record is clear. In view of the evidence, the undersigned submits that not only is

10  summary judgment warranted, but the level of willfulness, deceit, misrepresentations, if

11  not outright lies, should warrant appropriate sanction and attorneys fees during the

12  damages phase which will require trial.

13

14

15

16

17  V. CONCLUSION.

18

19    The Motion by MDTV for partial summary judgment on liability with respect to

20  Stephen Weinstock and the Weinstock Laser Center for Breach of Contract and tortious

21

22

23

24

25  [3]  Compare current sworn statement "In fact, I have not advertised on television or authorized other persons
26  to advertise my medical services on television in any manner, shape or form since June 2002. (MDTV
   NOL Ex. K at ¶ 57.) with sworn testimony "Yeah, we have a show that Robert did.. and ... does compete
   with MDTV and Robert is currently airing on that show. (MDTV NOL Ex. A at 155:1).

27

28

1  breach of the duty of implied covenant of good faith and fair dealing should be granted.

2

3                          Respectfully Submitted by

4                          MDTV MEDICAL NEWS NOW INC.

5                          AND PAUL ARGEN

6                          By: _____ Date: 6/29/06

7

8                          Jeffrey H. Greger
                           Jeffrey H. Greger, PC
9                          2306 South Eads Street
                           Arlington, VA 22202
10                         Tel:   571-331-4949
                           Fax:   703-979-2526
11

12
                           **Certificate of Service**
13

14

15
           Proof of Service Certification in accordance with Local Rule 5.2
16

17
     Proof of Service Certification in accordance with Local Rule 5.2
18
             I hereby certify that a copy of the foregoing  has been forwarded by overnight
19   delivery service with the U.S. Postal service this 29h day of June 2006 to all known
     current counsel of record, Robert D. Rowlett, 34762 Doheny Place, Dana Point, CA
20   92624;  Richard L. Sax, Esq., 2192 Palomar Airport Rd., 2d Floor, Carlsbad, CA 92008;
     Michael Butler, Esq., Katz Butler McCumber & Quinn, 150 East Ponce de Leon Ave,
21   Suite 250, Decatur, GA 30030; Carl Salisbury, Killian and Salisbury, 77 Brant Ave, Suite
     115, Clark, NJ;  and John R. Mayer, Esq., DE CASTRO & MAYER, LLP, 309 Laurel
22   Street, San Diego, CA 92101;

23

24   _____

25   Jeffrey H. Greger

26

27

28

MDTV-MEMO IN SUPPORT
Summary Judgment Motion              -22-                    '03 CV 0371BEN (AJB)